UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TOP TOBACCO, L.P., REPUBLIC TECHNOLOGIES (NA), LLC, and REPUBLIC TOBACCO, L.P., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) NO. 3:19-cv-00356 |
| WASSEM ABDELSHAHED and SMOKE DREAMS LLC, | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION

Top Tobacco, L.P. ("Top"), Republic Technologies (NA), LLC ("RT"), and Republic Tobacco, L.P. ("Republic") claim that Wassem Abdelshahed and Smoke Dreams LLC ("Smoke Dreams") are liable for the sale of counterfeit cigarette rolling papers in Kentucky. Plaintiffs bring multiple trademark claims under the Lanham Act, 15 U.S.C. § 1051 et seq.; an unfair competition claim under the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 et seq.; and common law claims for trademark infringement, unfair competition, and unjust enrichment. Before the Court is Smoke Dreams' Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, and Abdelshahed and Smoke Dreams' Rule 12(b)(6) motion to dismiss for failure to state a claim. These motions are ripe for decision. For the reasons that follow, the Rule 12(b)(2) motion will be granted and the Rule 12(b)(6) motion will be denied.

I. **Factual Allegations**[1]

Top, RT, and Republic manufacture, distribute, and sell tobacco and related products including cigarette rolling papers. Top owns the TOP mark. RT owns the JOB mark. Republic is the exclusive licensee and sole authorized distributor of TOP and JOB rolling papers in the United States.

Plaintiffs maintain an anti-counterfeiting program to protect against violations and infringement of the TOP and JOB marks. After Plaintiffs alerted the United States Customs and Border Patrol ("CBP") about counterfeit rolling papers, it intercepted 240 boxes of JOB rolling papers shipped from Shanghai, China. Wassem Abdelshahed was listed as the importer on the Customs Seizure Notice.

Abdelshahed resides in Brentwood, Tennessee. He owns and operates Smoke Dreams, a Kentucky limited liability company that operates a retail store named Smoke Dreams in Oak Grove, KY. Smoke Dreams "is the premiere smoke shop serving Hopkinsville, Clarksville, Paducah, Ft. Campbell, Dickson, and surrounding areas." (Doc. No. 1 ¶ 13.)

After CBP's seizure, Plaintiffs' investigator made contact with Abdelshahed, who first claimed he purchased the rolling papers on Alibaba, a Chinese online commerce website.[2] RT and Republic do not offer any JOB rolling papers for sale on Alibaba. Abdelshahed explained to the investigator that he ordered and imported the products to sell them at Chums, a Lebanon,

---
[1] This section relies upon the Complaint. (Doc. No. 1).

[2] The Complaint alleges that on information and belief, Alibaba offers for sale various types of counterfeit items. (Doc. No. 1 ¶ 46.) According to the Wall Street Journal, Alibaba "is China's — and by some measures, the world's — biggest online commerce company." What is Alibaba?, THE WALL STREET JOURNAL (available at https://graphics.wsj.com/alibaba/) (last visited February 11, 2020).

2

Tennessee convenience store. After Plaintiffs sent a cease and desist letter to Abdelshahed, he responded that the counterfeit JOB rolling papers were a gift for his personal use, which Plaintiffs questioned due to the large quantity of product.

Plaintiffs learned that Abdelshahed owns and operates Smoke Dreams, and that the store sells what purports to be TOP and JOB rolling papers. Republic has never sold any TOP or JOB rolling papers, or any other products, to Abdelshahed. Plaintiffs allege that Abdelshahed is involved in the willful purchase, sale, or distribution of counterfeit TOP and JOB rolling papers at Smoke Dreams. (Id. ¶ 53.)

Plaintiffs further allege Abdelshahed and Smoke Dreams have, with the specific intention to confuse and deceive the public, intentionally, knowingly, and willfully represented (and continue to represent) to buyers that the counterfeit TOP and JOB papers are authentic products when they are, in fact, counterfeits. This action harms Plaintiffs because it results in unfair competition with Republic, confuses the public, are inferior products, and weaken, blur, and tarnish the TOP and JOB marks, causing injury to Plaintiffs' business reputation and goodwill.

## II. **Smoke Dreams' Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction**

The plaintiff must show that the Court has general or specific jurisdiction when personal jurisdiction is challenged. Bristol-Myers Squibb Co. v. Super. Ct. of Cal. S.F. Cty., 137 S. Ct. 1773, 1780 (2017). The plaintiff's burden of showing personal jurisdiction "is 'relatively slight' where, as here, the . . . court rules without conducting an evidentiary hearing." MAG IAS Holdings, Inc. v. Schmuckle, 854 F.3d 894, 899 (6th Cir. 2017). "To defeat dismissal in this context, [the plaintiff] need make only a *prima facie* showing that personal jurisdiction exists." Id. Nevertheless, "the plaintiff may not stand on his pleadings, but must show the specific facts demonstrating that the court has jurisdiction." Miller v. AXA Winterthur Ins. Co., 694 F.3d 675, 678 (6th Cir. 2012).

A.  General Jurisdiction

General jurisdiction means that a court can hear any and all claims against a defendant. Daimler AG v. Bauman, 571 U.S. 117, 122 (2014). A court has general jurisdiction over a defendant-corporation when it has constant and pervasive, continuous and systematic affiliations with the forum state. See id.; Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011). As this Court has explained:

> Goodyear and Daimler "wrought [a] sea change" in the law of general jurisdiction because the "continuous-and-systematic standard" that had prevailed "for decades" is no longer the standard. BNSF Ry. Co. v. Tyrrell, 137 S. Ct. 1549, 1561 n.1 (2017) (Sotomayor, J., concurring in part and dissenting in part). Even though "Goodyear did not hold that a corporation may be subject to general jurisdiction only in a forum where it is incorporated or has its principal place of business, . . . it is fair to say [Goodyear and Daimler] raised the bar for this type of jurisdiction." Kipp v. Ski Enter. Corp. of Wisc., Inc., 783 F.3d 695, 698 (7th Cir. 2015) (citation omitted). As a consequence, "[a]ny additional candidates [beyond the principal place of business or state of incorporation] would have to meet the stringent criteria laid out in Goodyear and Daimler, which require *more than the 'substantial, continuous, and systematic course of business' that was once thought to suffice."* Id.; see Brown v. Lockheed Martin Corp., 814 F.3d 619, 626 (2d Cir. 2016) (concluding that, although plaintiff's arguments regarding general jurisdiction "might have sufficed under the more forgiving standard that prevailed in the past, [plaintiff's] contacts fail to clear the high bar set by Daimler to a state's exercise of general jurisdiction over a foreign corporation"); Patterson v. Aker Sols. Inc., 826 F.3d 231, 237 (5th Cir. 2016) (citing Goodyear and Daimler for the proposition that "[s]cholars have viewed the Court's recent personal jurisdiction decisions as part of an access-restrictive trend").

Global Force Entm't, Inc. v. Anthem Sports & Entm't Corp., 385 F. Supp. 3d 576, 581-82 (M.D. Tenn. 2019) (alteration in original) (emphasis added). Under Goodyear and Daimler, if the forum state is neither the place of incorporation nor the principal place of business, it is only in the exceptional case that a corporation's operations in a forum state might go beyond mere sales to be "so substantial and of such a nature as to render the corporation at home in that State." Daimler, 571 U.S. at 132-39 & n.19.

Smoke Dreams argues that its contacts with Tennessee are not so continuous and systemic to establish general jurisdiction. (Doc. No. 22 at 2, 6-7.) Plaintiffs rely on two declarations to establish general jurisdiction over Smoke Dreams. The first is a declaration of counsel that provides corporate information for Smoke Dreams and establishes that Abdelshahed is the organizer and registered agent of Smoke Dreams and resides in Tennessee. (Doc. Nos. 32, 32-3.) The second is a declaration of counsel's investigator, who states that the "U.S. Customs Seizure Notice [on 240 seized boxes] listed Mr. Abdelshahed's address at 9804 Glenmore Lane, Brentwood, Tennessee." (Doc. No. 30 at ¶ 5.) Plaintiffs contend that, because Abdelshahed lives in Tennessee and has tried to import JOB counterfeit papers to his home address, "[i]t is reasonable to infer that Abdelshahed oversees [Smoke Dreams'] activities from Tennessee" such that Smoke Dreams should be subjected to the general jurisdiction of this Court. (Doc. No. 29 at 17.)

Even if it could be inferred that Abdelshahed has an office for Smoke Dreams at his home in Tennessee, it does not follow that this would be sufficient to establish general jurisdiction over Smoke Dreams in Tennessee. See, e.g., Daimler, 571 U.S. at 158 (Sotomayor, J., concurring) ("[T]he majority holds today that Daimler is not subject to general jurisdiction in California despite its multiple offices, continuous operations, and billions of dollars' worth of sales there."); Global Force, 385 F. Supp. 3d at 582 (applying Daimler and rejecting Plaintiffs' argument that because defendant maintained an "an office and studio in Nashville" this was sufficient to confer general personal jurisdiction); Bauer v. Nortek Glob. HVAC LLC, No. 3:14-CV-1940, 2016 WL 5724232, at *6 (M.D. Tenn. Sept. 30, 2016) (finding that company was "not at home in Tennessee" for purposes of general jurisdiction, even though it had a distribution and manufacturing facility in the state). An office in Tennessee is especially weak to establish general jurisdiction because Smoke Dreams has submitted a sworn declaration from Abdelshahed, in which he avers that Smoke

5

Dreams is a Kentucky limited liability company, with its headquarters and principal place of business in Oak Grove, Kentucky. He further makes clear that Smoke Dreams does not sell goods in Tennessee, engage in online sales or telephone sales to customers in Tennessee, or ship products to customers in Tennessee. In fact, Smoke Dreams does not advertise in Tennessee. (Doc. No. 22-1 ¶¶ 2-5.)

Plaintiffs have not carried their burden of establishing that Smoke Dreams' activities in Tennessee are so "continuous and systematic" as to render it essentially at home in Tennessee, as required by the Supreme Court in Daimler. General jurisdiction over Smoke Dreams does not exist.

B.      Specific Jurisdiction

Specific jurisdiction deals with a defendant's contacts with the forum state relating to the claims at issue. The Sixth Circuit has identified three required criteria for specific jurisdiction:

> "First, the defendant must *purposefully avail* himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable."

AlixPartners, LLP v. Brewington, 836 F.3d 543, 549-50 (6th Cir. 2016) (emphasis in original) (quoting Air Prods. & Controls, Inc. v. Safetech Int'l, Inc., 503 F.3d 544, 550 (6th Cir. 2007)); LAK, Inc. v. Deer Creek Enters., 885 F.2d 1293, 1303 (6th Cir. 1989).

Here, the Court focuses on the purposeful availment criteria. Plaintiffs attempt to satisfy this criteria by relying upon Smoke Dreams' retail website, advertising in Tennessee, selling counterfeit rolling paper to a Tennessee resident, and importing rolling paper into Tennessee. None of these individually or collectively satisfy the specific jurisdiction test. This is because "[t]he emphasis in the purposeful availment inquiry is whether the defendant has engaged in some overt

6

actions connecting the defendant with the forum state." Bridgeport Music, Inc. v. Still N The Water Publ'g, 327 F.3d 472, 479-80 (6th Cir. 2003).

The Smoke Dreams website fails to establish purposeful availment because it is, at best, a passive website and not a website that reflects Smoke Dreams' intent to engage citizens of Tennessee. As the Sixth Circuit has explained:

> The "operation of an Internet website can constitute the purposeful availment of the privilege of acting in a forum state . . . if the website is interactive to a degree that reveals specifically intended interaction with residents of the state." Bird [v. Parsons, 289 F.3d 865, 874 (6th Cir. 2002)]. In evaluating whether the defendant's contact with the forum state constituted purposeful availment, this and other circuits have used the "Zippo [Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)] sliding scale" approach, which distinguishes between interactive websites, where the defendant establishes repeated online contacts with residents of the forum state, and websites that are passive, where the defendant merely posts information on the site. . . . Interactive websites can subject the defendant to specific personal jurisdiction, whereas passive websites are less likely to confer such jurisdiction.

Cadle Co. v. Schlichtmann, 123 F. App'x 675, 677-78 (6th Cir. 2005). Under the Zippo framework, "[w]hile a general posting on the internet is not sufficient to establish minimum contacts, courts may find personal jurisdiction appropriate where there is 'something more' to indicate that the defendant purposefully directed its activities to the forum state." Unidisc Music, Inc. v. Antibemusic S.r.l., No. 3-13-1451, 2014 WL 2573974, at *2 (M.D. Tenn. June 9, 2014); see One Media IP Ltd. v. S.A.A.R. SrL, 122 F. Supp. 3d 705, 717 (M.D. Tenn. 2015)).

Plaintiffs do not allege any interactive aspect to the Smoke Dreams retail website and Abdelshahed has confirmed that the Smoke Dreams retail store does not engage in online sales to customers in Tennessee. Nevertheless, Plaintiffs contend that the website is not passive because it has a "contact" page and visitors can submit testimonials. (Doc. No. 29 at 6 n. 4.) This is not enough to establish purposeful availment. Merely providing a mechanism for website visitors to

7

contact the Smoke Dreams store or to leave their own comments—basic elements of practically every single commercial website in existence—does not suggest that Smoke Dreams has affirmatively sought to engage in repeated contacts with Tennessee citizens. In short, "[t]he website evinces no interactivity *directed at Tennessee*." One Media IP Ltd., 122 F. Supp. 3d at 719 (emphasis added).

Plaintiffs also contend that the Smoke Dreams retail website is evidence of "targeted efforts to advertise and sell its goods to, and to form ongoing business contacts with Tennessee residents." (Doc. No. 29 at 6.) Citing Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883 (6th Cir. 2002), Plaintiffs argue that "even a passive website that 'holds itself out as welcoming [forum state] business' supports purposeful availment." (Id.) However, Neogen is of no help to Plaintiffs. There, the Court of Appeals did not decide whether the defendant's primarily passive website was sufficient to confer specific jurisdiction, because the defendant had 14 yearly mail-order transactions with Michigan customers that "represent[ed] something more than 'random, fortuitous, or attenuated contacts' with the state." Neogen, 282 F.3d at 892. Plaintiffs here make no allegations and offer no evidence of any such level of physical Tennessee contacts by Smoke Dreams.

Similarly misplaced is Plaintiffs' reliance on Bridgeport Music for the proposition that an "affirmative intent to market the defendant's products" should suffice to establish specific jurisdiction. In Bridgeport Music, the Sixth Circuit acknowledged that "[a]dvertising is among the activities that constitute 'reaching out' to forum state residents." 327 F.3d at 481 (internal quotations omitted). But it expressly rejected a finding of purposeful availment based upon allegations that the defendant had "engaged in advertising and marketing activities directed at Tennessee" that were supported by "a single statement." Id. Here, Plaintiffs' claim that Smoke

8

Dreams "targeted" Tennessee customers with advertisements is supported by a one-sentence statement on the Smoke Dreams retail website regarding the location of the store.

Plaintiffs contend that specific jurisdiction exists because Smoke Dreams has demonstrated an "intent to maintain continuing relationships and obligations" in Tennessee. (Doc. No. 29 at 7.) Plaintiffs argue that by locating the Smoke Dreams retail store "on the Tennessee border"—in what the U.S. Census calls the "Clarksville, TN-KY Metropolitan Statistical Area"—this proves its intrusion into Tennessee. (Id.) This argument is without merit. The location of a party for census purposes is irrelevant to purposeful availment. Nor is mere proximity of a party to a state border, without more. It may very well be that some Tennessee residents travel into Kentucky to shop at the Smoke Dreams retail store. However, it does not permit a conclusion that a business within driving distance of a state border is presumed to be availing itself of the neighboring state such that it can, without more, be hauled into court there. The location of the Smoke Dreams store is not enough to infer that Smoke Dreams "sought out" Tennessee customers in a direct fashion.

Next, Plaintiffs contend that it is sufficient that the Smoke Dreams retail store sold counterfeit rolling papers at least twice to a Tennessee resident, plaintiff's investigator. (Doc. No. 29 at 12.) They argue that these two sales demonstrate that Smoke Dreams "intends to form, and has formed, continuing business relationships with Tennessee residents." (Id.) Plaintiffs overlook that Defendant's investigator sought out Abdelshahed and Smoke Dreams to determine whether Smoke Dreams was selling counterfeit rolling papers. (Doc. No. 30 ¶¶ 18-21, 22-25.) Nothing before the Court suggest that Plaintiffs' investigator made purchases from Smoke Dreams in response to efforts made by Smoke Dreams to target Tennessee customers. Plaintiffs' counterfeiting investigation can hardly be attributed to Smoke Dreams' purposeful availment into the state of Tennessee.

Finally, Plaintiffs argue that specific jurisdiction exists from Abdelshahed importing counterfeit rolling papers to his Brentwood, Tennessee residence. (Doc. No. 29 at 9-10.) Plaintiffs believe that Abdelshahed's importing activity is the "active, moving force behind Defendants' counterfeiting" scheme. (Id.) In support of this argument, Plaintiffs cite Cree, Inc. v. Fastbuy, Inc., Case No.: CV 18-01802-CJC(ASx), 2018 WL 4850404, at *3-4 (C.D. Cal. July 16, 2018). In Cree, the plaintiff alleged that the defendants participated in a scheme to sell counterfeit light emitting diodes and component products from China in the United States. Plaintiffs allege the same here concerning rolling papers. That, however, is where the similarity ends. In Cree, the plaintiff established that one defendant, a New Jersey entity, leased a warehouse in California, imported counterfeit goods into California, stored the goods in warehouses in California, and then distributed those goods to buyers. Id. at *2. This evidence was sufficient to show that the defendant had purposefully directed its activities toward California. Id. at *4. Here, however, there is no allegation or evidence that Smoke Dreams has imported, stored, and distributed counterfeit rolling papers in Tennessee. Rather, they allege that counterfeit rolling papers have been sold at the Smoke Dreams retail store in Kentucky, and Abdelshahed was caught once by CBP trying to import counterfeit rolling papers to his Brentwood, Tennessee residence.

The Court appreciates that Plaintiffs believe Abdelshahed and Smoke Dreams may be using their relationship "as a sword and a shield."[3] Nonetheless, Plaintiffs have not carried their

---

[3] Plaintiffs state in passing that they "intend to develop additional facts proving that [Smoke Dreams] has no will of its own, observes no corporate formalities, co-mingles assets with Abdelshahed (likely in Tennessee accounts), and is merely Abdelshahed's alter ego through which he conducts his illegal activities." (Doc. No. 29 at 15.) The time to present such evidence was clearly now. The Court cannot rule on personal jurisdiction in anticipation of future arguments that may or may not be made. See Adams v. Prunick, No. 2:08-cv-156, 2009 WL 3074366, at *1 (W.D. Mich. Sept. 23, 2009) ("It the role of the attorneys to make the arguments before the Court and it is the role of the Court to make decisions based upon those arguments."). Plaintiffs had the ability to move for jurisdictional discovery, but did not do so. See Global Force, 385 F. Supp. 3d at 583.

burden to establish the purposeful availment factor. There is insufficient evidence that Smoke Dreams has engaged itself in Tennessee in relation to this dispute at issue. There is no specific jurisdiction over Smoke Dreams and it will be dismissed for lack of personal jurisdiction.

III. **Abdelshahed's Rule 12(B)(6) Partial Motion To Dismiss**

To survive a Rule 12(b)(6) motion, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). "If the plaintiffs do not nudge their claims across the line from conceivable to plausible, their complaint must be dismissed." Lutz v. Chesapeake Appalachia, L.L.C., 717 F.3d 459, 464 (6th Cir. 2013) (internal citation and alterations omitted). Dismissal is likewise appropriate where the complaint, however factually detailed, fails to state a claim as a matter of law. Mitchell v. McNeil, 487 F.3d 374, 379 (6th Cir. 2007). In deciding a motion to dismiss, the court is not required to accept summary allegations, legal conclusions, or unwarranted factual inferences. Mixon v. Ohio, 193 F.3d 389, 400 (6th Cir. 1999). Abdelshahed does not seek dismissal of Count Four.

A. Count One

Abdelshahed argues that Count One—Plaintiffs' Lanham Act trademark counterfeiting claim—should be dismissed because Plaintiffs have not established the essential element that he used their marks in commerce. (Doc. No. 22 at 14-15.) Plaintiffs respond that Abdelshahed takes too narrow a view of the Complaint, which is not limited to the counterfeit papers seized by CBP. (Doc. No. 29 at 18-19.) The Court agrees with Plaintiffs.

The Lanham Act prohibits the "use in commerce of any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services [where] such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). "To recover on a federal trademark counterfeiting claim, a plaintiff must show that: (1) the defendant infringed a registered trademark in violation of 15 U.S.C. § 1114; and (2) the defendant intentionally used the mark knowing it was a counterfeit as the term counterfeit is defined in 15 U.S.C. § 1116." Laukus v. Rio Brands, Inc., 391 F. App'x. 416, 425 (6th Cir. 2010). Regarding the first element, a claim of trademark infringement under § 1114 requires a plaintiff to show "(1) that it owns a valid, protectable trademark; (2) that the defendant used the mark in commerce and without the registrant's consent; and (3) there was a likelihood of consumer confusion." Ford Motor Co. v. Heritage Mgm't Grp., Inc., 911 F. Supp. 2d 616, 621 (E.D. Tenn. 2012). "Commerce" means "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. Regarding the second element, under § 1116, "counterfeit mark" is a mark that is registered with the United States Patent and Trademark Office, regardless of "whether or not the person against whom relief is sought knew such mark was so registered." Id. § 1116(d)(1)(B)(i).

Plaintiffs have alleged that their trademarks are valid and protectable, Abdelshahed engaged in an ongoing scheme of unlawful activities involving the unauthorized use of Plaintiffs' marks in commerce through the importation and sale of counterfeit rolling papers, and this scheme was likely to result in consumer confusion, satisfying 15 U.S.C. § 1114. The alleged counterfeiting scheme includes, but is not limited to, the counterfeit rolling papers seized by the CBP in January of 2018. Critically, the alleged scheme continues through the sale of the counterfeit rolling papers at the Kentucky Smoke Dreams retail store. Plaintiffs have further alleged that Abdelshahed

intentionally used counterfeits as defined by law, satisfying 15 U.S.C. § 1116. Count One therefore sufficiently pleads the elements of a trademark counterfeiting claim.

B. Count Two

Abdelshahed next argues that Count Two—Plaintiffs' Lanham Act trademark infringement claim—must be dismissed because it is duplicative of the trademark counterfeiting claim. (Doc. No. 15 at 15-16.) Plaintiffs respond that this is a different cause of action. (Doc. No. 29 at 24-25.) Again, Plaintiffs are correct. These two claims are not duplicative. Rather, trademark counterfeiting is a subset of trademark infringement, has different elements, and "is not redundant." Ohio St. Univ. v. Skreened Ltd., 16 F. Supp. 3d 905, 910-11 (S.D. Ohio 2014). As a sister court has explained, while "[a]ll counterfeits infringe . . . not all infringements are counterfeit. Infringement . . . is merely one prerequisite to a finding of a counterfeit mark." Id. (citing Schneider Saddlery Co., Inc. v. Best Shot Pet Prods. Int'l, LLC, No. 1:06-CV-02602, 2009 WL 864072, at *4 (N.D. Ohio Mar. 31, 2009)).

Plaintiffs have sufficiently pled the elements of a trademark infringement claim under § 1114 by alleging that (1) they own valid, protectable trademarks; (2) Abdelshahed used the marks in commerce and without their consent; and (3) there was a likelihood of consumer confusion. Ford Motor Co., 911 F. Supp. 2d at 621. This claim stands separate from Plaintiffs' trademark counterfeiting claim. See, e.g., Zinganything, LLC v. Import Store, 158 F. Supp. 3d 668, 673-74 (N.D. Ohio 2016) (explaining the difference between trademark infringement and trademark counterfeiting claims and concluding that the plaintiff had "established the elements required to state a claim for relief for [both] trademark infringement and counterfeiting pursuant to 15 U.S.C. § 1114").

C. Counts Three and Five

Abdelshahed argues that the next two counts are both untimely. (Doc. No. 22 at 16-17.) These are Count Three—false designation of origin under § 1125(a) of the Lanham Act—and Count Five—unfair competition under the TCPA.

*Count Three: Lanham Act § 1125(a) Claim*

"The Lanham Act does not contain a statute of limitations, so determining whether a Lanham Act claim is time-barred depends upon the defendant's ability to show that the claim is barred by laches." Kehoe Component Sales Inc. v. Best Lighting Prods., Inc., 796 F.3d 576, 584 (6th Cir. 2015) (internal quotations omitted). "Laches is the negligent and unintentional failure to protect one's rights." Nartron Corp. v. STMicroelectronics, Inc., 305 F.3d 397, 408 (6th Cir. 2002). "Unlike statutes of limitations, 'laches is not . . . a mere matter of time[,] but principally a question of the inequity of permitting the claim to be enforced.'" Ford Motor Co. v. Catalanotte, 342 F.3d 543, 550 (6th Cir. 2003) (quoting Holmberg v. Armbrecht, 327 U.S. 392, 396 (1946)). As the Court of Appeals has explained:

> Ordinarily, a party asserting laches must show "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." Nartron, 305 F.3d at 408. In the Lanham Act context, we have developed a framework that helps add substance to the general equitable principles embodied in the doctrine. For claims under the Lanham Act, the laches period begins to run when the plaintiff has "actual or constructive knowledge of the alleged infringing activity." Id. (citation omitted). If the plaintiff has filed its Lanham Act claim within the time that it would have been required to file in the forum state a state-law claim for injury to personal property, then the plaintiff's delay in asserting its rights is presumptively reasonable. See id. But a delay beyond the analogous limitations period "is presumptively prejudicial and unreasonable." Id.; see also Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc., 270 F.3d 298, 321 (6th Cir. 2001).

Kehoe, 796 F.3d at 585-86. The presumption that arises after the lapse of an analogous limitations period is not irrebuttable; in the end, the laches analysis depends upon whether the plaintiff lacked

14

diligence in asserting its claim and "whether the defendant was prejudiced by the plaintiff's dithering." Id. at 585.

Plaintiffs claim to have been alerted to Abdelshahed's alleged infringement scheme on January 17, 2018, when they received a CBP notice regarding the intercepted shipment of counterfeit rolling papers. Yet, Plaintiffs did not file this action until April 30, 2019. (Doc. No. 1.) Abdelshahed argues that Count Three is presumptively barred by the doctrine of laches.

For a § 1125(a) claim, the relevant benchmark is the TCPA's one-year statute of limitations. See Johnny's Fine Foods, Inc. v. Johnny's Inc., 286 F. Supp. 2d 876, 881 (M.D. Tenn. 2003) (holding one-year TCPA statute of limitations applies to unfair competition claims under 15 U.S.C. § 1125(a)); Fed. Express Corp. v. U.S. Postal Serv., 75 F. Supp. 2d 807, 816 (W.D. Tenn. 1999) (same). While the presumption applies here, it is rebuttable. Kehoe, 796 F.3d at 585

Generally, "attempts to resolve a dispute without resorting to a court do not constitute unreasonable delay for determining the applicability of the doctrine of laches." Id. at 585 (internal quotations omitted). Further, a party "should be afforded some latitude to assess both the impact of another's use of an allegedly infringing trademark as well as the wisdom of pursuing litigation on the issue." Id. (internal quotations omitted). Thus, prejudice remains "a prerequisite to the application of the doctrine of laches." Wynn Oil Co. v. Am. Way Serv. Corp., 943 F.2d 595, 608 (6th Cir. 1991); see also Johnny's Fine Foods, 286 F. Supp. 2d at 881 (laches in a trademark case requires both an unreasonable delay and "a resulting material prejudice to the defendant"). "Absent significant material prejudice to a defendant, courts are generally hesitant to conclude that trademark infringement claims are barred by laches for [delays of] short [time] period[s]." Laukus, 391 F. App'x at 422 (citing MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:29 (collecting cases holding delays between 3 months and 13 years not sufficient for laches defense).

15

The Court will deny the motion at this stage because Abdelshahed has made no claim or argument to have suffered any prejudice from the three-month delay between expiration of the presumptively reasonable time period in January 2019 and the filing of this action in April 2019. (See Doc. No. 22 at 16-17.) In the absence of a claim of prejudice, Plaintiffs' prompt filing of this action after obtaining confirmation of Abdelshahed's ongoing activities in March/April 2019 is sufficient at this stage of the case.

*Count Five: TCPA Claim*

The statute of limitations under the TCPA is "one (1) year from a person's discovery of the unlawful act or practice, but in no event . . . more than five (5) years after the date of the consumer transaction giving rise to the claim for relief." Tenn. Code Ann. § 47-18-110; Vanderbilt Univ. v. Scholastic, Inc., 382 F. Supp. 3d 734, 761 (M.D. Tenn. 2019); Phillips v. Nationstar Mort'g, LLC, No. 3:13-cv-01414, 2016 WL 2866164, at *5 (M.D. Tenn. May 17, 2016). A plaintiff's TCPA claim accrues at the "discovery of the unlawful act or practice." Schmank v. Sonic Auto., Inc., No. E2007-01857-COA-R3-CV, 2008 WL 2078076, at *2 (Tenn. Ct. App. May 16, 2008).

Here, Plaintiffs admit that they were aware that a shipment of 240 boxes of counterfeit rolling papers from China addressed to Abdelshahed were seized by CBP in January 2018. Plaintiffs allege that their investigator contacted Abdelshahed six months later, and Abdelshahed stated that he had purchased the rolling papers from China for sale at his store. Plaintiffs sent Abdelshahed a cease-and-desist letter on October 5, 2018. They received no response for nearly three months. When Abdelshahed responded in late December by claiming that the Chinese rolling papers were a gift, Plaintiffs sent a follow-up letter in February 2019 stating that they did not believe his representations. Soon after, Plaintiffs learned that Abdelshahed was operating the Smoke Dreams retail store. In March and April 2019, Plaintiffs' investigator went to Smoke

Dreams and purchased rolling paper samples, which Plaintiffs had tested and confirmed were counterfeit. Plaintiffs then filed suit.

Based upon these facts, Plaintiffs' TCPA claim is timely. Importantly, the TCPA claim encompasses Abdelshahed's "sale, offering for sale, distribution, promotion or advertising of its goods in commerce in such a manner as to cause a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of its goods or services," and is not based solely on the January 2018 failed importation. (Doc. No. 1 ¶ 117.) Until Plaintiffs learned of the Smoke Dreams store, they did not have anything more than a suspicion that Abdelshahed was engaged in this activity. When their investigator made purchases of rolling papers at Smoke Dreams and the purchased products were tested, Plaintiffs obtained confirmation that Abdelshahed was actually engaging in this ongoing conduct and, as a result, causing Plaintiffs injury. Plaintiffs then promptly filed suit within the TCPA's statute of limitations.

D. Counts Five, Six, And Seven

Abdelshahed contends that Counts Five, Six, and Seven should be dismissed against him because they relate to Smoke Dreams' conduct, not his. (Doc. No. 22 at 17.) Specifically, Abdelshahed argues that Plaintiffs "do not specify what conduct by [him] forms the basis of their claim." (Id.) Plaintiffs respond that it is well-settled that, as a corporate officer, Abdelshahed can be held personally liable for trademark infringement in which he personally participated, and they have sufficiently alleged his personal participation. (Doc. No. 29 at 22-23.)

"[T]he general rule is that an officer of a corporation may be personally liable for the corporation's infringement without piercing the corporate veil. An officer must do more than merely control corporate affairs. The officer must personally take part in the infringing activity or direct others to do so in order to be liable. In such a case, the officer is liable as an actor, not merely

as an agent or owner of the corporation." CCA Global Partners, Inc. v. Carpetmax Flooring Ctr., No. Civ. A. 4:02CV-215-M, 2006 WL 581016, at *2 (W.D. Ky. Mar. 6, 2006) (citing MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:24 (4th ed. 2005)).

Abdelshahed does not dispute that he could be liable for the actions of Smoke Dreams, just whether Plaintiffs have sufficiently alleged his individual actions. (See Doc. No. 22 at 17.) Viewing the Complaint as a whole, Plaintiffs do allege Abdelshahed's personal involvement with Smoke Dreams and the infringement/counterfeiting scheme at the heart of the Complaint. The Complaint includes specific details concerning Abdelshahed's attempted importation of 240 boxes of counterfeit Chinese rolling papers, and Plaintiffs' subsequent discovery of the counterfeit papers sold at the Smoke Dreams store operated by Smoke Dreams, of which Abdelshahed is the organizer, owner, and corporate officer. Plaintiffs specifically allege that Abdelshahed uses Smoke Dreams, the LLC and the store, for "counterfeiting and infringement" by means of the "the willful purchase, sale, and distribution of counterfeit TOP brand and JOB brand cigarette rolling papers." (Doc. No. 1 ¶ 53.) Plaintiffs further allege that Abdelshahed has "intentionally, knowingly, and willfully represented (and continues to represent) to buyers that the counterfeit rolling papers are authentic TOP or JOB products when they are, in fact, counterfeits under law." (Id. ¶ 59.) Finally, Plaintiffs allege that Abdelshahed gains "a direct financial benefit from [the alleged] infringing activities." (Id. ¶ 61.) The Complaint contains sufficient allegations of Abdelshahed's personal involvement in the infringement scheme that forms the basis of Counts Five, Six and Seven for those claims to proceed against him individually.

E. Count Eight

Finally, Abdelshahed argues that the unjust enrichment claim should be dismissed because Plaintiffs have not established what benefit was conferred on Abdelshahed, nor have they

established that Abdelshahed "sold any of their products such that a benefit would have been conferred." (Doc. No. 22 at 17-18.) Plaintiffs respond that the Complaint is not limited to the counterfeits seized in January 2018; Abdelshahed is alleged to have continued his unlawful acts as recently as the sale of counterfeit rolling papers in March-April 2019; and there are allegations of benefits conferred on Abdelshahed from his trademark infringement. (Doc. No. 29 at 23-24.)

Plaintiffs have adequately pled an unjust enrichment claim. Plaintiffs allege that Abdelshahed has gained a "direct financial benefit" from deliberately infringing activities including the willful purchase, sale, and distribution of counterfeit TOP and JOB rolling papers. (Doc. No. 1 ¶¶ 53, 61.) They further allege that Abdelshahed has been able to obtain "monetary and reputational benefits" and the value associated with the TOP and JOB marks. (Id. ¶ 148.) Plaintiffs further allege that Abdelshahed has taken advantage of the goodwill associated with the TOP and JOB marks (id. ¶ 64) to procure customers he "otherwise would not have been able to obtain" (id. ¶ 144). Plaintiffs therefore plausibly allege that Abdelshahed has received a benefit from the use of Plaintiffs' trademarks and that it would be inequitable for Abdelshahed to retain the value of that benefit. This is sufficient to survive the instant motion.

## IV. **Conclusion**

For the foregoing reasons, (1) Smoke Dreams' Rule 12(b)(2) Motion to Dismiss will be granted and Smoke Dreams will be dismissed, and (2) the Rule 12(b)(6) Motion to Dismiss will be denied as to Wassem Abdelshahed and denied as moot as to Smoke Dreams.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE